vs. Joseph R. Biden Jr. in his official capacity as president and others. Hear first from Mr. Bernie and then Mr. St. John. Thank you, Your Honor. Good morning. May it please the Court. Andrew Bernie on behalf of the United States. The District Court's nationwide injunction against implementation of Section 208 of Executive Order 14008 should be vacated or at least narrowed for three principal reasons. First, the Executive Order itself is plainly lawful. Second, the individual lease sale postponements at issue were also lawful. And third, the District Court's justification for imposing nationwide relief in particular was patently deficient. Turning to the first issue, the Executive Order itself only directs a pause on new oil and gas leasing to the extent consistent with applicable law. The District Court did not meaningfully engage with this lawfulness constraint, and neither plaintiffs nor the District Court have persuasively explained how the Executive Order can be unlawful when it instructs compliance with the law. This is not a case like the Ninth Circuit's decision in San Francisco v. Trump and other decisions where courts have struck down presidential directives with similar consistent with public qualifications. In those cases, there were no circumstances in which the directives at issue could be applied consistently with the law, so the courts could only give effect to the directive by essentially rendering it a dead letter. That is not the case with Executive Order 14008. We think Interior's discretion under OXLA and the MLA are quite broad, and I'll perhaps get to that this morning, but under any possible interpretation of those statutes, there are numerous circumstances in which the Executive Order can be applied lawfully. We detail several on pages 12 of our reply brief. Just to be clear, we don't think the Executive Order is reviewable for the reasons we lay out in our briefs. Plaintiffs themselves admit that it's not reviewable under the APA, and we think it's clear that plaintiffs sought a preliminary injunction on their APA claims, and the district court, in fact, reviewed it under the APA. We also don't think that this is the type of claim that is reviewable under an ultra-virus theory as articulated by the Supreme Court in Franklin v. Massachusetts and Dalton v. Specter, but even if the Executive Order were itself reviewable, it is plainly lawful. So that leads me to the second point, which is that the individual lease sale postponements at issue were also plainly lawful under the MLA and OXLA. So I'll turn first to the MLA. I mean, just as a general matter, for all the reasons we set forth in our brief, there's no evidence that Congress in 1987 intended to displace the Department of the Interior's longstanding discretion recognized by the Supreme Court to decide whether to lease. The legislative history of the statute, in fact, shows precisely the opposite. Indeed, the 1987 House report accompanying the amendments in our brief, House Report 100-378, states directly that the quarterly leasing mandate is subject to the Secretary's preexisting discretionary authority. We think that's directly on point, but we actually don't think the court necessarily even has to reach these broad issues in this case because the first quarter postponements were not postponed because of the Executive Order. They were postponed because of a need to comply with NEPA, which the district court and plaintiffs have never contested. The BLM has the authority, indeed the obligation, to do. And I also don't think there's any doubt that the record shows this was, in fact, the reason. I would, in particular, direct the court's attention to pages 1011 to 1012 of the record on appeal. This is a memo contemporaneous with the postponements in Colorado, Montana, Dakota, the Dakotas, Utah, and Wyoming, setting forth specific NEPA-related reasons for those postponements. Another memo on 1013 to 1014 addresses the NEPA problems that necessitated postponements in Alabama and Mississippi. There was also a postponement in Nevada, but that merely continued a postponement that started with the prior administration. And it was, as we point out in our brief and is reflected at page 989 of the record on appeal, it was made, the decision was made and posted on BLM's website before the executive order even issued. And this is in addition to the NEPA-related explanation that we provided with a declaration with our preliminary injunction opposition at pages 986 to 991, setting forth the specific NEPA-related problems that led to those postponements. So these individually self-postponements were plainly lawful, as was the executive order itself. So on the onshore side, there was no justification for the broad executive order that was issued or, indeed, even a narrower injunction. And as to the offshore postponements, these, too, were plainly lawful. The district court held categorically that any delay or cancellation of a potential lease in a five-year program was a significant revision of the program requiring resort to program-like procedures. We think that's clearly wrong. First of all, Oxley's text does not provide any support for such a categorical rule. So what do you ask this court to do? So I think what we would ask the court to do is to say, first of all, is to vacate the injunction on the grounds that the executive order itself, even if reviewable, was lawful, and that the individual lease sale postponements were also lawful. On the MLA side, they weren't even taken pursuant in the first quarter, pursuant to the executive order. And the offshore lease sale postponements wouldn't support the broader injunction the district court entered, but in any event were also lawful. Just to, if I could, just speak to the district court's justification and then explain why we think those postponements of lease sale 257 and 258 were lawful under any plausible theory. Let me ask you a question. Certainly. How long of a pause did it take before you have a significant alteration in the congressional plan? Well, Your Honor, I mean, I think that has to be analyzed according to the individual actions the agency takes implementing the executive order as applied to particular lease sales. Certainly, we've never contested that if plaintiffs believe that the Department of the Interior is required to hold a particular lease sale at a particular time, they can always bring a suit under Section 706.1 of the APA to compel particular lease sales. We think they wouldn't prevail on such a suit because the statute provides significant discretion, but that's the option. But I think the focus of the court's inquiry here were the actual steps, and we don't dispute that on the offshore side steps were taken to implement the executive order. The actual steps that the Department of the Interior took that the injunction found we think wrongly were unlawful, and that's the postponements of lease sales 257 and 258. And I do want to make, I just wanted to note the uniform practice that we outline in our briefs where under administrations of both parties, it has been routine for individual lease sales, proposed lease sales not to be held for various reasons. I would also point the court's attention in that regard to the relevant language in this particular five-year program. I think in determining whether there's been a revision, let alone a significant revision, it's significant what the program actually says. And if you look at the program, the program says a couple things. First of all, at pages 1333 to 1334 of the record on appeal, it expressly says that lease sales will be subject to a rigorous pre-decisional process, will require 15 steps, three to five years to complete, and it expressly refers to the proposed leasing areas, I believe, as the areas available for leasing consideration. And then at page 1391 of the record on appeal, it expressly says that the secretary may reduce or cancel lease offerings on account of climate change in particular, which is the subject of— Your view was the effect of the 1987 amendment. So, I mean, we say a few things about that. First of all, we think that under all the parties' interpretations, it allows and indeed requires what BLM actually—the actual grounds for the first quarter lease sale deferrals. On its face, it seems to have shifted to a more mandatory shift or command to lease. There is a quarterly lease sale provision, Your Honor, but I don't—we don't think— What was the effect of it? We think that like other mandates within the MLA before and after 1987— Now, what was the effect of the 87 Act? The effect of the 87 Act is that when BLM makes the decision to make lands available for leasing, that it holds leases quarterly. But it doesn't, as the House report makes clear, it doesn't change BLM's antecedent discretion to decide to offer lease sales in the first place. But even if you look at the language of Section 226B1A, it mandates quarterly lease sales only where BLM finds areas eligible and available for leasing and does not provide any restrictions, either in that language or in the legislative history, as to how—as to when BLM must find lands eligible and available for leasing. And, of course— But there could be a quarter—quarters could come and go where there is no lease sale, and that wouldn't be a violation of— No, Your Honor. I mean, that has happened. I mean, under—so in the second quarter of 2020, there were no lease sales. And there have also been many quarters where there have been no lease sales held in particular states. I believe Georgia, for example, Georgia and West Virginia are plaintiffs in this case. I believe there were no lease sales held in either of those two states throughout 2017 or 2020. Texas—for the states of Louisiana, Texas, and North Dakota, I believe from 2007 to 2020, I don't think this—I'm not sure this is all in the record, but there are—there were lease sales in only four or five quarters during those years. So I think it is common for lease sale—for BLM to decide not to hold sales for a variety of reasons. We cite in our brief the example of a sale postponed in early 2020 because of workload and staffing considerations under the prior administration. And so there is no evidence that—there's no evidence that Congress intended in 1987 to alter BLM's preexisting discretion that had been recognized by the Supreme Court in Udall v. Tolman. And we think that would have been a major step for Congress to take, and there would be some evidence that Congress actually intended to alter that longstanding feature of the statute. In the legislative history, the House report says precisely the opposite. We think that's more or less directly on point in saying that Congress intended the quarterly lease provision to work precisely the way you say it was. What effect did it have? We think that the quarterly lease provision directed, like other mandates, that once—when BLM makes the antecedent decision to lease, that it should hold leases at least quarterly. But in any event, the first quarter lease sale postponements were postponed because of NEPA reasons, were lawful under any plausible interpretation. If I could just turn briefly to—and as were the offshore sales, I think that under any plausible interpretation, these were temporary postponements of two potential lease sales, only one of which was at a particularly advanced stage of consideration. Given the language from the five-year program that I just discussed, we don't think that was a revision of the program at all, but it certainly was not a significant revision, particularly when BLM—or excuse me, BOEM has never resorted to program-like procedures to postpone or even cancel lease sales throughout the 44-year history of the five-year program provisions. I did want to talk briefly about the nationwide injunction aspect of this decision. We think it's clear for the reasons in our brief and this court's decision that we discussed in our reply brief in Louisiana v. Becerra, narrowing a similar nationwide injunction, that there was no basis for the nationwide injunction that was issued here. The district court's analysis in this issue was only three or four sentences, and it cited a generalized interest in uniformity, which, as this court explained in Louisiana v. Becerra, would be a justification for nationwide relief in more or less any case involving the government. It is plainly insufficient here. I would also just note on that point, I mean, several states in which first-quarter sales were postponed— at least two other states, North Dakota and Wyoming—brought their own challenges in separate forums. So, in this case, there was no basis, we think, for the district court— Another question about the statute. We have a question of what is under the five-year plan with its four-step procedures and processes. You have the question of what is a significant change. That is, you may revise and approve, but if you make a significant change, then you have to go back through the four-step program again. So, what is a significant change? So, one example—and if I could, I'd like to answer this question and then reserve the rest of my time for rebuttal if that would be satisfactory to the court. So, one example of a significant change, Your Honor, would be the change identified in Interior's 1996 opinion that we discussed in our— I'm sorry. Slow down a little bit. Oh, I'm sorry, Your Honor. I get that a lot. One example of a significant change, I think, would be the example identified in the 1996 Department of Interior M opinion that we cite in our brief, which is adding any sale that was not set forth in the proposed program. I mean, that's consistent with the statute itself, which I think at 1344d.3 says no lease sale can be added if it's for an area that was not part of the five-year program. In terms of our analytical framework, given the language of the executive order itself, that insofar as it's legal to do so, permissible to do so, it doesn't ask you to change any law. So, the inquiry is just what can be done and what is prohibited. The policy says pause, but it's conformative with the law. And in the traditional language, that's not new language, and it's a coverage. So, with the framework, then we ask, okay, what is it? What would be the legal impediment to it? Right. So, I mean, on the executive order itself, I mean, I think that's right. I mean, it's a generalized directive to the agencies to effectuate the president's policy priorities, but only to the extent the law permits it to do so. As to, you know, what would be a significant change, I think adding a sale would be. But I think the broader questions, what is clear is that in the 44-year history of these programs, in which Interior and the numbers from the Congressional Research Service article we cite are quite striking, lease sales frequently are not just postponed but not held for every five-year program. And so Interior has never considered that to be a significant change. We don't think this case requires the court to expound on the outer limits of Interior's authority to deem a revision non-significant. We just think the postponements here are clearly consistent with the relevant language of the five-year program and are not significant in any event. Thanks. If I could, I'd like to reserve the remaining time for rebuttal unless there are other questions. Yes, sir. Please the court. Scott St. John, Deputy Solicitor General for the State of Louisiana and 12 other plaintiffs' states. History rhymes. In the 1970s, as the agency would have it, Congress was unhappy with the Secretary of Interior's exercise of discretion and passed OSLA in a time of geopolitical instability, disruption of foreign oil supplies, and skyrocketing gas prices. Congress was concerned with increasing reliance on foreign sources of oil but specifically found that increasing reliance is not inevitable but subject to significant reduction by increasing the development of domestic supplies. Congress stated that resources on the outer continental shelf should be made available for, quote, expeditious and orderly development. And according to Bohm, meeting energy needs is a primary purpose of the 1978 amendments. Accordingly, the Secretary shall prepare and maintain an oil and gas leasing program. That's 43 U.S. Code 1334. Make no mistake, this is Congress exercising its Article I power to direct the development of a national resource. The Mineral Leasing Act is no different. In 1987, Congress added a shall. There shall be quarterly sales. The plaintiffs' stakes think that is clear. But any ambiguity on that point has been resolved by the Secretary of Interior herself. In 1988, in response to that statutory change, the Secretary promulgated a regulation stating that each proper BLM state office shall hold sales at least quarterly if plans are available for leasing. That's 43 CFR 3120.1-2A. And you see that regulation recited again and again and again in the documents. Let me ask you a question about the use of appalls. This is not the first time this has happened. What do you say in response to Justice Rehnquist's view that with the change of administrations, there inherently should be a right of the new administration to take hold and to survey at the outset? And the appalls that he contemplated was perfectly proper and made sense in terms of accommodating our structure changes of administration.  One, subsequent to Justice Rehnquist, we have FCC v. Fox and Encino Motorcars. And what the Supreme Court has said is that, of course, an agency can change its mind. But when it does so, it has to grapple with its prior findings and has to give a reasoned decision for the change. And just a change in administration is not a reasoned decision. I'm not sure what you're saying. You're saying that a change in administration has no effect in terms of the power of the administration to slow things down, if you will, so that it can deploy its policy views with regard to development, such as environment. They may have a heavier accent on the concern about the environment versus the business, exploitation, et cetera. Those are the kinds of the inerrant political kinds of questions. And the new administration will start to accent and go in a different direction in terms of accent. And they have an opportunity to do so. But then the question becomes, at what point does that pause become illegal, violate the law? In other words, all it asks you to do is to slow it down so they can examine what changes, if any, they want to make to it, but in conformity with law. So that's the question. Where did it become illegal? Why don't we zoom in on the microcosm of lease sale 257? There was a time specified for the sale. There was a what was going to be sold that had been specified. That's in the rule of the record of decision. And there were various findings supporting that, including extensive analysis of the greenhouse gas issue, climate change, if you will. The administration could, in theory, change its mind. But what it had to do was grapple with those prior findings, that prior analysis. What the administration cannot do, what FCC v. Fox and Encino-Mortecar's forbid, is just to come in and say, I've changed my mind. The end. Well, basically, you're saying that some of these processes, some of these leases were already out of the barn, so to speak. They were beyond recall by any branch of government. The Congress had said that, and to the extent that you attempt to recall it when they're out of the barn, meaning that the Congress has already, you're violating the legislative mandate. So your argument ultimately is they're violating the legislative mandate. Yes, Your Honor. Congress set up a machine. I understand the machine, the four-step process, and the question of how we fit a significant change, which would require you to go back through the four steps again. So on the question of significance, one, the plaintiffs' states disagree that it's a one-way ratchet, where an addition of a lease sale would always be significant, but the withdrawal would not be. We don't know why prior lease sales have been withdrawn. I give my colleague credit. He just says reasons. Those reasons aren't in the record, and presumably there was some type of rationale given to comply with the APA, but that's not what happened here. On the significance point, there's a separate issue where you run into it in NEPA pretty frequently with cumulative impacts. Doing one thing may not be a problem, but doing one, two, three, four, five does make it a problem. I think you would see the same thing with significance. Well, some of these, as I read the district court order, were required to go to care for the lease that had not been cleared by the basic environmental test. How can you justify that? Are you referring to the land side leases, Your Honor? I'm referring to the fact that, as I read these materials, the effect of what you're asking for is what the district court did. That's what I'm saying, not you. What the district court here ordered effectively was a sale of land lease, if you will, that had never been cleared, received a basic examination under the environmental provisions. No, Your Honor, that's not correct. Certainly, lease sale 257, there was an environmental impact statement at the programmatic level, and there was a separate environmental impact statement for the individual lease sale or environmental analysis. On the shore side, the district court acknowledged that there was a mixture of cancellations. Some appeared to be on the basis of environmental issues, and that was classically the case. You would see a record of decision saying the District of Idaho has entered an injunction that would cover this lease sale, or the District of Montana has entered an injunction against a related lease sale that performed the same analysis. So, for that specific reason, we're going to delay this lease sale for additional analysis. That was some of the first quarter land side leases. The second quarter cancellations or postponements, call it what you will, there's an email from Laura Davis, who was the deciding official, saying, I'm telling everyone to put the word postponed on the website so that we can comply with the executive order. If you parse the district court's opinion carefully, that's why he said there was some evidence of environmental cancellations that were legitimate. There were some on the land side that were purely, this is postponing, just pointing a finger at the EO. And that's not an administrative record at all. I guess a subtler point on your significance question, Your Honor, is significance itself is judicially reviewable. The solicitor for the Department of the Interior opined as much, so there has to be an administrative record, and he cautioned that, that there needs to be an administrative record on the significance determination. Right back where we started, here, there's no administrative record, so it's a reviewable issue. That's certainly reviewable, but there's no record to review, so it's per se arbitrary and capricious. Continuing on your significance inquiry, Your Honor. Let me ask you a question about your standing. Certainly, Your Honor. What's the standing of Louisiana here? Louisiana receives tens of millions of dollars a year from these lease sales. It receives that funding in three buckets, if you will. There's a bonus when the lease is first sold. There's ground rent, so just like if you were renting a house, the leaseholder pays rent every month to the federal government, and Louisiana gets a big check once a year. Those things are not going to happen for a lease sale that doesn't occur, and then you get royalties, the state gets royalties on the back end. And so there could be no doubt that if a lease sale is not held, the bonus payment's not going to occur, and then if it's postponed, there'll be a delay in the ground rent payments, and the district court noted that. The delay in getting... On the related issue is that even the plan itself acknowledges the impact to the state's economy, to employment. Both the plan, the five-year plan, and the record of decision for 257 identify impacts, and that was one of the considerations of that list. That's what should have been done if the administration wanted to change its mind, but that was not done. Continuing with the significance, Judge Graves, I think you hit on this a little bit with my colleague, at what point does a pause become something bigger? I think here we actually have a little window into that. I have it in a couple of ways. Lease sale 258, it wasn't a rescission of a lease sale. That was just at a draft environmental impact statement soliciting public comments. That was halted. That's a halt to the machinery for leasing. That's not a particular halt to a particular lease sale. That's stopping the machinery. As to whether it's ongoing, April 20th, White House Climate Advisor Gina McCarthy, President Biden remains absolutely committed to not moving forward with additional drilling on public lands. The challenge we face is that we had a court that ordered that a new lease be done. We know there are laws that were written decades ago that challenge our understanding now of what the key issues are moving forward. The climate is certainly one of them. Certainly the White House Climate Advisor is telling the public, hey, this is a bigger halt. How far does the halt extend? On May 6th, the Congressional Research Service issued a report. For the first time in history, there's going to be a gap between five-year plans because the administration has made no progress on the next five-year plan. The current five-year plan expires at the end of June. Are you saying there's an overall five-year plan versus a three-to-five-year plan with regard to some land that's been identified for sale or lease? Just an overall three-to-five-year plan. There's an overall. Comprehensive plan. The statute requires a five-year plan that generically, in the way it's been done, is it generically identifies when and, but largely where, the sales will occur. So, for example, it might say in 2024, there'll be two sales. One will be for the western Gulf of Mexico. So the trigger is once the land's been identified. Yes. I mean, the land, well, the five-year plan identifies, like, a broad area of land and then the subsequent record of decision will be more specific and say, okay, these are the specific parcels. So if you look at the 257 record, I mean, it's pretty specific. That hasn't happened. So the plan, I mean, there will be no, we talk about 40-something years of experience, something that's unprecedented. For the first time, there will be no five-year plan on time. There will be a gap. The administration has reported the machinery. Mr. St. John, the Supreme Court in the Newark case said, before we can compel agency action, you must identify a discrete duty that the agency has to apply. I don't see any discrete duty that's been formulated here. A couple of points, Your Honor. One, the statutes can be looked at as a machine. Congress set up the machine to run. What's happened is a brake has been put on the machine. You're not having to compel anything in particular. You remove the brake, the machine should start running again. Two, certainly with respect to OSLA, it calls for expeditious and orderly development, quote, as rapidly as possible. Those are, in the context of that statute, those are commands. MLA, similarly, there's shoddy quarterly lease sales. That's a command. It's an unqualified command. Whatever discretion there is, it has been channeled through statutory requirements. So, for the agency to unwind what was done in the past, it would have to weigh those same statutory factors. It's Section 18 of OSLA. So, I think you're really hitting on two points, Judge Dennis. One, there is the statutory shall, the affirmative command. And then, two, with respect to the specific projects, the brake has been applied without complying with either the APA or the statutory requirements. You haven't revealed refusal to comply with those principles. You haven't shown any discreet duty that the agencies haven't performed or complied with. Your Honor, I respectfully disagree. The Secretary shall prepare and maintain an oil and gas leasing program to implement the policies, end quote, of OSLA. That's 43 U.S. Code 1334. That's a pretty clear command to execute. The statute lists policies, and then it commands the Secretary to prepare and maintain a program for expeditious development of the Outer Continental Shelf. Those are very clear commands.  My apologies, Your Honor. Have they refused to do what they're supposed to do? Yes, Your Honor. I mean, there is no five-year plan in development. That would be kind of the bigger picture. Certainly, 257 was rescinded without complying with the APA. That was, as Judge Higginbotham said, the horse was out of the barn at that point. Recalling it would be difficult in the extreme. The machinery has been shut down for 258 and for the five-year plan. I want to make sure I'm hearing you correctly. You said there's no five-year plan in development. Correct, Your Honor. Are you saying there is no five-year plan? The current five-year plan extends through June 30th, and then it will expire. The five years will be up. Okay, so there is a five-year plan. There is a five-year plan. It has not yet expired. It has not yet expired. All right. The next problem is that after that, the administration has not developed the next five-year plan, so there will be no more lease sales. That's kind of a statutory void. What do you do when the administration doesn't develop the five-year plan? You want to get ahead of everything. Well, we absolutely want the lease sales that should have occurred, 257. It was halted without complying with the basics of the APA. There was no basis to halt that. But then we also—these plans take a year or two to develop. As a pilot, you've got to stay ahead of the airplane. If you're reacting to where the airplane is now, you're flying into the ground. I understand that Interior has counseled only two individual sales, not moving from plans to sales. Those are on somewhat different paths, parallel paths, but they're on different paths. The Gulf of Mexico and the Cook Inlet. Is that correct? Yes, Your Honor. Again, it's the machinery that's been stopped. A couple of quick points in closing. Reviewability. This was an APA case. We moved for a preliminary injunction on the basis of the APA. The district court, in the opening paragraph of its order, said, I'm reviewing. One quick one.  Yes, I do, Your Honor. The APA says an action shall be set aside. It doesn't include a geographic limitation. Here, there are separate issues. For example, if you have leasing in the Gulf of Mexico, the way it's divided under COMISA, Florida's not a part of this case. Florida's impacted by what goes on. I don't know for sure, but I'm going to guess up the East Coast, where you have multiple states bordering a sale, how do you piece this out on a state-by-state basis? Reviewability. The fact that the President's executive order may have been reviewed, incidentally, and that's Chamber of Commerce v. Reich. We cited it in the brief. The government is inviting a naked circuit split with the D.C. Circuit. I see that I'm out of time. If there are no further questions, thank you for your time, Your Honors. Thank you, sir. Thank you, Your Honor. I'd just like to make a few narrow points and then some broader thoughts. First of all, Judge Graves, just to correct any confusion I may have caused, when I said three to five years, I was referring to what the program says it will often take to go through the process to issue leases that are set forth in a five-year program. So that pertained to the leasing stage. Just in terms of the finality of lease sale 257 and 258, when Interior took action, Judge Higginbotham, just to clarify, lease sale 257 was not out of the barn. I think, in your words, it's true that a record of decision was... I'm trying to frame the question. Right, right. So the record of decision was a NEPA document. It was selecting the BLM's preferred alternative under NEPA. It was not itself sufficient. It was, I think, if you look at the five-year program, it was step 11 out of 14 or 15 steps to issue a sale. Among other things, the final notice of sale was never published. So the Department of the Interior would not have been required to go forward with that sale if it had just done nothing. It issued the record of decision, frankly, as it made clear in the Fed Reg Notice to clear up confusion, to make clear that it was reconsidering the sale. So we don't think that that decision was final. And lease sale 258 was certainly not final. I don't see how it could... Simply canceling a comment period, which is all the Department of the Interior did here, could possibly be a final agency action subject to the APA. Again, plaintiffs can always bring a Section 706-1 suit to compel agency action unlawfully held, but here such a suit would plainly fail given that there is a long-standing history of cancellations but certainly postponements for a variety of reasons. I did just want to... Mr. St. John mentioned second-quarter lease sales. The second-quarter lease sales were postponed as well, but that was done, I believe, April 23rd, which was after the complaint here was filed, which is outside the scope of the complaint. If you look at the document, the email he referred to, which I believe is on ROA 1018, what it says is BLM was temporarily postponing in April. It hadn't made a decision at that point not to hold it within the second quarter at all as it considered how to implement the executive order. So if anything, that makes clear that BLM had made... As they've said, BLM had made no decisions at that point about how to implement the executive order, which makes further clear, in addition to the detailed reasons for the first-quarter postponements, that those were based on NEPA concerns, not the executive order. On the five-year program, just to be clear, Judge Doty, plaintiffs in motions practice seek supplementation of the record on various topics, which Judge Doty granted. He denied supplementation as to the next five-year program. There's separate litigation on that in the Western District of Louisiana, but Judge Doty even recognized that's just not part of this case. Lastly, I just want to emphasize that, you know, Judge Dennis, you referenced a discreet legal duty that the Department of the Interior violated. I think that's exactly the right framing, and there was no violation. The executive order itself, as we've said, is plainly lawful, but the first-quarter sales were plainly deferred for permissible reasons, and the postponements of the two OXLA sales, Mr. St. John says I'm relying on facts not in the record. I didn't mean to do that. I think it's a matter of public record that every five-year program has resulted in significantly more sales scheduled than held, and it's also a matter of public record that there were, I think, no... that the Department of Interior never followed complex program-like procedures to effectuate those cancellations. That requires, among other things, submission of a plan as would a significant revision if it was to Congress. The Department of the Interior has never considered... has never considered even an individual lease sale cancellation, let alone a postponement like occurred here to be a significant revision and to hold otherwise would, we think, be contrary to decades of history and be utterly impractical. So in terms of what we think the case is about, we think the case is about the executive order, which is, even if reviewable, is planned... You're saying that if you looked at the pattern of activity of cancellations and processes before and after the executive order, you're going to see the same pattern? I'm sorry, Your Honor, could you... If you looked at the pattern of the activity of leasing before and after the order of the district... before and after the order here, the issue of administration, you'll see the same pattern. I don't know if I'm saying you'll see the same pattern, but what I'm saying is that... I mean, we acknowledge, just to be perfectly clear about this, as we were expressed about this, that lease sale... But are we going to see something different? It's not a pattern. You're suggesting, then, that the pause, then, has changed the process of... I thought you were arguing that inherent in the process will be some reexamination, some cancellations, some delays, etc. Well, no, the executive order itself does not speak to how it will be implemented. We did apply the executive order to lease sales 257 and 258. We've never denied that. And the onshore... first-quarter onshore lease sales were deferred for unrelated reasons. The district court enjoined the executive order. Our point is that the... To ask the question more directly, the question of what effect has the executive order had on the administration of the leasing plans. Well, the executive order was... The executive order was enjoined in June of last year, so we have not... So we've obviously been complying with the injunction, not been considering the executive order. No, we're not. That got cut... You got cut short of it. That's fine. They got over that, but I guess... Right. I'm not here to say what would have happened if the injunction hadn't been issued. My point is that the district court... My point is that the executive order is lawful, and the district court did not identify any unlawful action implementing the executive order. So for that reason, we would ask that the injunction be vacated. If there are no further questions. I think... I think we have your argument. Okay, thank you very much. All right, that case will be, I'll say only, that's a final case to be already argued. We'll take that case under advisement with the other cases.